**In re James W. ROBERTSON,**
**Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals**

**No. 91–SP–1522.**

District of Columbia Court of Appeals.

Submitted April 28, 1992.
Decided May 15, 1992.

Before FERREN, TERRY, and FARRELL, Associate Judges.

PER CURIAM:

This reciprocal discipline matter is before the court on the recommendation of the Board on Professional Responsibility that we publicly censure respondent for violating Disciplinary Rules 6–101(A)(3) (neglecting legal matter) and 1–102(A)(5) (engaging in conduct prejudicial to administration of justice).[1] We conclude that public censure is an appropriate sanction under the mitigating circumstances of this case.

On February 1, 1989, the United States Court of Appeals for the Fourth Circuit suspended respondent from practice before that court for twelve months and fined him $1,000 for failure to comply with the Federal Rules of Appellate Procedure and the

---

1. Hearing Committee No. 8 concluded, and the Board agreed, that there was insufficient evidence to establish a violation of Disciplinary Rule 2–110(B)(3) (mandatory withdrawal due to mental or physical condition). Bar Counsel does not challenge that conclusion.

Fourth Circuit's internal operating procedures and instructions. *In re James W. Robertson,* No. 88–9516 (4th Cir.1989) (unpublished order). The court ordered the suspension and fine after respondent had filed notices of appeal in three cases in the first half of 1988 but then failed to prosecute them or even respond to the court's directives and inquiries about those cases. Before the court issued the order, respondent had failed to respond to a show cause order. *See* Report and Recommendation of the Board o[n] Professional Responsibility, attached as appendix.

■ We first note that our rule governing reciprocal discipline applies to disciplinary actions taken by "any court of the United States as defined in Title 28, Section 451 of the United States Code, the highest court of any state … and any other agency or tribunal with authority to disbar or suspend an attorney from the practice of law in any state, territory, or possession of the United States." D.C.Bar R. XI, § 11(a). In turn, 28 U.S.C. § 451 (1968 & 1992 Supp.) defines "court of the United States" to include "the Supreme Court of the United States, courts of appeals, [and] district courts." We therefore conclude that the Fourth Circuit's suspension of respondent falls within our reciprocal discipline provisions. *See In re Solerwitz,* 575 A.2d 287 (D.C.1990); *In re Evans,* 533 A.2d 243 (D.C.1987).

D.C.Bar R. XI, § 11(c) provides, *inter alia:*

> Reciprocal discipline shall be imposed unless the attorney demonstrates by clear and convincing evidence, that:
>
> .    .    .    .    .
>
> (3) The imposition of the same discipline by the Court would result in grave injustice;
>
> . . . .

In this case, Bar Counsel, the Hearing Committee, and the Board each have recommended public censure, rather than any harsher reciprocal discipline, citing the mitigating factor of respondent's deteriorating health over the relevant time period. Because respondent did not respond to the Fourth Circuit's show cause order, it did not have an opportunity to consider this factor before it imposed the one year suspension. The Board also notes, however, that respondent has been informally admonished twice before for unrelated ethical violations.

We agree with the Board that public censure is within the range of sanctions this court has previously ordered in similar cases. *See, e.g., In re Jones,* 521 A.2d 1119 (D.C.1986) (after two prior unrelated informal admonitions, respondent publicly censured for neglecting legal matter and engaging in conduct prejudicial to administration of justice); *In re Thompson,* 478 A.2d 1061 (D.C.1984) (after one prior informal admonition for same type of violation, respondent publicly censured for neglecting legal matter and engaging in conduct prejudicial to administration of justice).

■ We observe that the highest state courts regulate the practice of law in the states which constitute the territorial jurisdiction of the United States Court of Appeals for the Fourth Circuit. Thus, the federal appeals court was limited to suspending respondent from the practice of law before that court only. This differs from an action by a state supreme court, which would ordinarily impose suspension from the practice of law throughout the state, not just before a particular court. On the other hand, when a federal court censures, rather than suspends, a lawyer, the consequence is not much, if any, different from a censure by the state's highest court.

■ Therefore, any "reciprocal" discipline we impose must take into account any difference, in kind or scope, between discipline imposed in the federal jurisdiction and the disciplinary sanctions available in our own "state" jurisdiction. For example, our disciplinary rules do not include fines as a permissible sanction. *See* D.C.Bar R. XI, § 3. The Board therefore did not and could not consider such reciprocal discipline in this case, even though the Fourth Circuit imposed a $1,000 fine. *See also In re Solerwitz,* 575 A.2d at 292 (ordering public censure rather than one year suspension as

imposed by United States Court of Appeals for the Federal Circuit); *In re Evans*, 533 A.2d at 244–45 (ordering public censure rather than disbarment as imposed by federal district court).

Because of mitigating factors, found by the Board, we conclude that public censure is the appropriate and just sanction in this case. *See* D.C.Bar R. XI, § 11(c)(3); *see also In re Thompson*, 478 A.2d at 1064 (review of recommended sanction must be done with deference to Board's sense of equity).

Accordingly, it is

ORDERED that James W. Robertson is hereby publicly censured.

*So ordered.*

## APPENDIX

### DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:

### JAMES W. ROBERTSON

Bar Docket No. 90–89

### REPORT AND RECOMMENDATION OF THE BOARD OF PROFESSIONAL RESPONSIBILITY

This is a reciprocal discipline case, which the Court of Appeals referred to the Board following the imposition of discipline by the United States Court of Appeals for the Fourth Circuit. We determined, pursuant to D.C.Bar R. XI § 18(5), that the matter should be referred to a hearing committee.

This case now comes before the Board following the report of Hearing Committee No. 8. Respondent was charged with violations of DR 6–101(A)(3) (neglecting a legal matter entrusted to him); DR 2–110(B)(3) (failing to withdraw from representation when his mental or physical condition rendered it unreasonably difficult for respondent to carry out his employment effectively); and DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice). The charges were based on Respondent's filing three notices of appeals in the Fourth Circuit in the first half of 1988

and thereafter failing to adequately prosecute them.

A hearing was held on July 9, 1990 and concluded on October 16, 1990. The Hearing Committee found that Respondent had neglected three matters entrusted to him, in violation of DR 6–101(A)(3), and had engaged in conduct prejudicial to the administration of justice, in violation of DR 1–102(A)(5). The Committee found that there was insufficient evidence to establish a violation of DR 2–110(B)(3) (failing to withdraw despite a debilitating physical or mental condition) (Hearing Committee Report ("Report") at 6–10). The Committee recommended that Respondent be publicly censured (Report at 13).

The Hearing Committee's findings and recommendation are based on the following facts:

Between April and June of 1988, Respondent filed in the Fourth Circuit notices of appeal in the three cases at issue here. On April 8, 1988, Respondent filed a notice of appeal in *United States v. Jan M. Brooks*, and was directed on May 10, 1988 to file a counsel of record form, an attorney admission or registration form, a docketing statement, and a transcript order (if needed) within ten days. Thereafter, the court issued a briefing order on August 11, 1988 that directed Respondent to file his brief and appendix no later than September 15, 1988. The court then sent a follow-up letter again directing Respondent to file a counsel of record form and docketing statement. Respondent never filed any of these documents, including the brief (Report at 3–4).

Respondent filed a notice of appeal in *United States v. Lawrence Michael Branch* on May 20, 1988. On July 6, 1988 the clerk directed him to file a docketing statement and transcript order, as well as a counsel of record form and an attorney admission or registration statement within ten days. Once again, Respondent failed to file any of the required information (Report at 3).

On June 29, 1988, Respondent filed a notice in *United States v. Kevin Von Spi-*

*vey,* appealing a district court judgment denying Mr. Spivey pre-trial release. The appeal was docketed on July 8, 1988, and Respondent was directed to file a memorandum in support of the bail appeal within seven days and a counsel of record form along with an attorney admission or registration record form within ten days. Subsequently, despite several requests from the court, Respondent failed to file the memorandum in support of the appeal and failed to file an attorney registration form (Report at 3).

As a result of these failures to file the required documents, on December 12, 1988, the court issued an order directing Respondent to show cause why he should not be disciplined for his failure to comply with federal appellate procedures and with the court's operating procedures and instructions. Respondent did not respond to the order, and the court suspended him from practice for one year and fined him $1,000.00 (Report at 4).

Respondent did not dispute that he missed those filings, but claimed that he did so because of his deteriorating physical condition. Debra Jones, a registered nurse who had reviewed respondent's medical records, testified that Respondent first saw a Dr. Osbourne on May 26, 1988, complaining of fatigue (Hearing Transcript, July 9, 1990 ("Tr. 1"), at 18). Dr. Osbourne conducted a series of laboratory tests, but because he was unable to make a certain diagnosis and because Respondent returned on June 2 still complaining of fatigue and fever, he referred Respondent to Dr. Pistole (Tr. 1 at 20). Dr. Pistole apparently saw Respondent during the months of June and early July (Tr. 1 at 21). Respondent then saw a Dr. Primack on July 26, and Dr. Primack decided that there was a need for a bone marrow aspiration to see whether there was a problem with lymphoma, a type of cancer (Tr. 1 at 21). Respondent was diagnosed with leukemia some-

time at the end of July, (Tr. 1 at 26) and on August 1, he began to receive the drug alpha interferon, which often causes flu-like symptoms as a side effect (Tr. 1 at 69). Before the alpha interferon, nothing was given to Respondent that might have affected his energy level, other than an antibiotic that might have caused slight tiring (Tr. 1 at 70). Respondent continued to lose weight and become more fatigued, so on September 24, he began to take prednisone to combat his lack of energy (Tr. 1 at 69).[1] During this entire period, none of his doctors ever told him to discontinue his law practice (Tr. 1 at 90). On October 28, during the Spivey trial, Respondent experienced some disorientation in court. While the trial was in recess, he saw Dr. Primack and was prescribed prednisone. On November 2, he fell into a coma and was taken to the hospital, where he remained for the month of November, often in a very confused and aggressive state (Tr. 1 at 92–93).

Robert E. Ratner, M.D. testified that the symptoms from which Respondent suffered from January through November, 1988, suggested that Respondent may have been suffering from diabetes.[2] However, he had not examined Respondent personally, and he declined to say that Dr. Primack had misdiagnosed Respondent's condition (Tr. 2 at 34). He testified that a person with diabetes would suffer from cognitive dysfunction that would grow progressively worse as glucose levels in the patient rose, but that dysfunction could vary depending on what the patient ate on any given day (Tr. 2 at 46). He noted that prednisone would worsen the patient's condition (Tr. 2 at 27–28).

Dr. Ratner testified, however, that he could not make a judgment as to the degree of impairment that Respondent was suffering since he did not examine Respondent himself (Tr. 2 at 44). He could only say that the disorder progresses over time as glucose levels rise. This progression is

---

1. Prednisone is a drug that is often very effective in treating leukemia, however, the effect of the drug is to increase blood glucose levels.

2. At the time of the hearing, Dr. Ratner was the director of the Diabetes Center at George Washington University Medical Center, and an expert in the area of endocrinology and metabolism, with a specific interest in diabetes.

gradual until the glucose levels reach a very high threshold, and then there is a rapid progression (Tr. 2 at 37). He testified that, despite the condition, a person could function and get through the activities of daily life, including employment (Tr. 2 at 37). He also testified that a person who exhibited the symptoms that Respondent exhibited in November could have been functioning at a normal cognitive level six months previous to that time (Tr. 2 at 45).

Respondent testified that during the period of January through November, he grew progressively weaker (Tr. 1 at 87). He recalled how upset he was when the doctors told him that he had leukemia, but he said that he was hopeful and that he constantly called the Fourth Circuit clerk's office to try and buy time until his recovery (Tr. 1 at 104). However, he never did officially communicate with the Fourth Circuit in writing about his health problems (Tr. 1 at 134). He also admitted that he was fully aware of his responsibilities to his clients and to the Fourth Circuit concerning the appeals, and that he failed to fulfill many of these responsibilities (Tr. 1 at 111, 113–119, 122–23, 126–28). He justified his failures to comply by pointing to his physical problems, and he added that, "the last thing on my mind was worrying about filing some paper with the Fourth Circuit when I was told I was suffering from hairy cell leukemia ..." (Tr. 1 at 128).

Severely undermining Respondent's contention that his physical condition precluded him from fulfilling his obligations was his testimony that, during the same time period, he was regularly performing more onerous tasks. He testified that he taught a law school class through May. He resumed teaching two classes in September, four days a week, and he attended class on a regular basis (Tr. 1 at 110). He further testified that between May and November he maintained an active law practice. His activities included: defending a client in a criminal trial on May 4, which resulted in acquittal (Tr. 1 at 106); defending a client at trial May 10, which resulted in a hung jury (Tr. 1 at 107); representing a client in a motion hearing on May 13 (Tr. 1 at 107); arguing a motion for reconsideration on May 23 (Tr. 1 at 124); representing a client on May 25 in a Pennsylvania criminal trial, which resulted in conviction on a lesser offense (Tr. 1 at 107); getting a case dismissed in Superior Court in early June (Tr. 1 at 108); trials on June 3 and June 13 (Tr. 1 at 108); submitting on June 15 a motion for revocation of detention order, accompanied by a 15–page memorandum containing sophisticated legal and factual arguments (Tr. 1 at 126); defending a client at trial on July 1 in which the jury convicted his client, but in which he was able to get the conviction set aside in the interest of justice (Tr. 1 at 108–109); participating in a multi-day trial from September 26–28 in which his representation was so skillful that his client was acquitted (Tr. 1 at 119); and preparing for the Spivey trial with his client (Tr. 1 at 138).

The Hearing Committee found that, during the period from April to September, 1988, Respondent's conduct constituted neglect and conduct prejudicial to the administration of justice. The Committee acknowledged that Respondent was hospitalized and was physically unable to fulfill his responsibilities from November 3–19, 1988, and it made clear that it did not even consider any events occurring after September 1988 (Report at 8). It found that before his hospitalization, however, Respondent received notice of and understood every requirement of the appeals process and that he showed a "knowing, willful and conscious indifference for the interest of his three clients." The Committee concluded that Respondent's illness did not prevent him from processing the appeals. Because Respondent's illness should not have prevented him from fulfilling his responsibilities in the Fourth Circuit cases, the Committee found that the evidence was insufficient to show that Respondent violated DR 2–110(B)(3) by failing to withdraw from representation.

Having found violations, the Hearing Committee considered aggravating and mitigating factors to determine the sanction to be imposed. As aggravating factors, it

considered that Respondent had twice before been informally admonished for ethical violations, and that in this case, even after being restored to health, Respondent did not recognize the extent of his poor judgment during the relevant time period (Report at 11). As mitigating factors, the Committee considered that none of Respondent's clients were substantially prejudiced by his inadequate assistance, and that he was indeed becoming progressively less well during the relevant period while taking medication that would have reduced his physical stamina (Report at 12).

### DISCUSSION

The Board agrees with the Hearing Committee's findings that Respondent violated DR 1-102(A)(5), by repeatedly failing to comply with the Federal Rules of Appellate Procedure and the Fourth Circuit's internal operating procedures and instructions, and DR 6-101(A)(3) by neglecting to prosecute the three appeals he noticed in the Fourth Circuit. The Board also agrees with the Hearing Committee's finding that the evidence was not sufficient to establish a violation of DR 2-110(B)(3), since it is clear from the hearing transcript not only that Respondent was capable of carrying out a representation, but also that in matters other than the three appeals at issue here, he did in fact adequately represent his clients.

The record in the hearing contains ample evidence showing that Respondent failed to adequately follow through on the three appeals that he noticed in the Fourth Circuit. He testified that he was aware that certain steps needed to be taken to prosecute the appeals, but that because of his condition, he did not complete these steps. The court has stated that the unexcused failure to perform a required function demonstrates proof of neglect. *In re Banks*, 461 A.2d 1038 (D.C.App.1983). His failure to prosecute the appeals clearly constituted neglect.

The record also abundantly illustrates his repeated failures to comply with proper appellate procedures and specific instructions from the Fourth Circuit. He testified that he was aware that certain documents needed to be filed, but because he was so worried about his health, filing some paper with the Fourth Circuit was the "last thing on his mind."

Though Respondent was undoubtedly concerned about and distracted by his illness, this did not excuse him from his ethical responsibilities to his clients and to the court. It is apparent from Respondent's busy court and class schedule that he was not nearly as physically and emotionally incapacitated during the months of April through September as he would have had the Hearing Committee believe. None of his doctors ever told him not to work, and Dr. Ratner testified that someone in his condition from April through September could function normally in his daily life, including in his employment. It was evident from the testimony that he was functioning well in his law practice, yet he still failed to process properly the three appeals. During this period, he was able to make several court appearances and file several pleadings more complicated than most of the documents he failed to file in the three appeals. He was functioning well enough to reason out and present sophisticated legal and factual arguments in these other matters. Not only was he able to perform adequately in these other cases, but he apparently enjoyed a fair amount of success in them. All of this belies Respondent's contention that he was physically and emotionally unable to perform what were, in most cases, simple ministerial tasks in the three appeals. The Board, like the Hearing Committee cannot accept Respondent's claim that, though he was able to successfully defend his clients in these other cases throughout the summer of 1988, he could not respond to the Fourth Circuit's inquiries. It is hard to imagine that Respondent could not even muster up enough energy to make a formal written explanation of his condition to the court.

### SANCTIONS

In light of Respondent's prior history of discipline for similar offenses and his fail-

**▮▮▮▮▮▮▮▮**

ure even after his illness to recognize his wrongdoing, the Hearing Committee gave serious consideration to recommending a thirty-day suspension. However, Bar Counsel persuaded the Committee that the appropriate sanction was public censure, and the Committee so recommended.

Sanctions in circumstances comparable to those present in this case have ranged from public censure to suspensions of 30 days or longer. Bar Counsel cited three cases which he believed to be most analogous to this case, each which resulted in public censure. *See In re Solerwitz*, 575 A.2d 287 (D.C.App.1990) (Respondent publicly censured for filing series of frivolous appeals, repeatedly violating court orders, and consistently failing to follow appropriate procedural rules and otherwise interfering with the Federal Circuit's work); *In re Jones*, 521 A.2d 1119 (D.C.App.1986) (Respondent publicly censured for neglecting a legal matter entrusted to her and for engaging in conduct prejudicial to the administration of justice; two prior informal admonitions, unrelated in character to the violations at issue); *In re Thompson*, 478 A.2d 1061 (D.C.App.1984) (Respondent publicly censured for neglecting a matter and engaging in conduct prejudicial to the administration of justice by failing to appear for hearings in three different matters; one prior informal admonition for same type violation and Respondent admitted that he had erred).

In other cases, a thirty day suspension has been imposed. *See In re Fitzgerald*, No. 86–1701 (D.C.App. May 8, 1987) (failure to appear in nine cases, failure to respond to inquiries from Bar Counsel, and a similar prior reprimand); *In re Foster*, 581 A.2d 389 (D.C.App.1990) (neglect and intentional failure to seek lawful objectives, incapacitating stroke, and prior censure); *In re Evans*, M–126–82 (D.C.App., Dec. 17, 1982) (failure to appear on two different trial dates and complete lack of regard for the disciplinary process).

Although we cannot conclude that the matter is without doubt, we believe that this case is closest to *Jones* and *Thompson*.

In both those cases, the violations were the same as here, conduct prejudicial to the administration of justice and neglect. In both of those cases there were prior informal admonitions. Although in *Jones* the prior admonitions did not relate to the same kind of conduct, in *Thompson* the admonition was for the same type of violation. Therefore, our recommendation is that Respondent be publicly censured by the Court.

We note in passing that while we are not inclined to recommend more severe discipline than that recommended by the Hearing Committee, we are not inclined to attach much significance to one of the factors that the Hearing Committee viewed as mitigating Respondent's conduct *viz*, that his clients were not prejudiced. If his clients were not prejudiced, Respondent can hardly claim credit. Missing filings certainly put his clients at risk that their appeals would be dismissed. Moreover, in one instance, Respondent was appealing from a denial of bond pending trial. Such appeals are time-sensitive; they become moot if not completed before the trial. Yet Respondent failed to file his brief on time. In sum, the absence of prejudice was fortuitous, and it is not a factor for which Respondent can claim responsibility. He was putting his clients at risk.

Our view of this lack of prejudice is consistent with the court's discussion in *In re Reback*, 513 A.2d 226 (D.C.App.1968). In that case, the court agreed with the Board's finding that the respondents had violated several disciplinary rules by, among other things, falsifying their client's signature on a divorce complaint. The court noted that, though the respondents' dishonesty caused the client little, if any, prejudice, the most important consideration was that their dishonesty prejudiced the administration of justice itself. *Id.* at 232. To the extent that the court considered this lack of prejudice to the client in mitigation at all, it did so only because the violation could not possibly have prejudiced the client. This was so because the facts stated in the complaint with the false signature were identical to those contained in the original complaint signed by the client. *Id.*

at 232, n. 5. If the falsification had gone unnoticed, no substantive harm to the client would have ensued.

## CONCLUSION

Based on the foregoing, the Board recommends that Respondent be publicly censured.

BOARD OF PROFESSIONAL RESPONSIBILITY

By: /s/ HAMILTON P. FOX, III
        Hamilton P. Fox, III

Dated: December 12, 1991

All members of the Board concur in this Report and Recommendation except Mr. Cohen and Ms. Kaiser who did not participate.